IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD DIPPLE, LINDA DICKENS and ) 
JOHN CHEVEDDEN, )
 )
 )
Plaintiffs, )
 ) Case No. 12-cv-01415
v. )
 )
MICHAEL R. ODELL, ROBERT H. HOTZ, ) DEMAND FOR JURY TRIAL
IRVIN D. REID, JAMES A. MITAROTONDA, )
JOHN T. SWEETWOOD, JAMES A. )
WILLIAMS, JANE SCACCETTI, M. SHAN )
ATKINS, NICK WHITE, and THE PEP BOYS )
– MANNY, MOE & JACK, )

Defendants.

## CONSOLIDATED COMPLAINT FOR VIOLATION OF §§ 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiffs Edward Dipple, Linda Dickens, and John Chevedden ("Plaintiffs"), by their attorneys, allege upon information and belief, except for those allegations that pertain to Plaintiffs, which are alleged upon personal knowledge, as follows:

## NATURE OF THE ACTION

1.     This is an individual stockholder action brought by holders of the common stock of Pep Boys - Manny, Moe & Jack ("Pep Boys" or the "Company") against the Company and the members of the Company's Board of Directors (the "Board" or the "Individual Defendants") arising out of their violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a false and materially misleading preliminary proxy statement (the "Proxy") in connection with the

proposed buyout of the shares of Pep Boys common stock (the "Proposed Transaction") pursuant to the terms of an Agreement and Plan of Merger ("Merger Agreement"), dated January 29, 2012.

2.     Pursuant to the terms of the Merger Agreement, Pep Boys, the nation's leading automotive aftermarket service and retail chain, will be acquired by The Gores Group, LLC ("The Gores Group"), a private equity firm led by founder and Chief Executive Officer ("CEO"), Alec E. Gores.  The Gores Group will acquire all of the outstanding common shares of Pep Boys for $15.00 per share in cash (the "Proposed Transaction").   The total enterprise value of the transaction is approximately $1.0 billion.

3.     The Board has abdicated its responsibilities to the Company and to Pep Boys shareholders by not performing a detailed, full, and transparent process and by omitting material information from the solicitation documents that renders other information contained in the Proxy materially misleading.  As a consequence, shareholders have not been provided material information, which has rendered materially misleading other statements in the Proxy.

4.     Plaintiffs seek to enjoin or to rescind the Proposed Transaction in the event of its consummation if all material information regarding the Proposed Transaction is not provided to the Pep Boys' shareholders prior to the vote on the merger.

## THE PARTIES

5.     Plaintiff Edward Dipple is a stockholder of Pep Boys and has held shares at all times relevant to this Action.

6.     Plaintiff Linda Dickens is a stockholder of Pep Boys and has held shares at all times relevant to this Action.

7.     Plaintiff John Chevedden is a stockholder of Pep Boys and has held shares at all times relevant to this Action.

8.      Defendant Pep Boys is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal executive offices located at 3111 W. Allegheny Avenue, Philadelphia, Pennsylvania, 19132.  According to its website, Pep Boys is a multi-billion dollar nationwide retail and service chain specializing in automotive repair and commercial auto parts with over 700 stores across the U.S. and Puerto Rico.  As of November 25, 2011, the Company had approximately 52,721,000 million shares issued and outstanding trading under the symbol "PBY" on the New York Stock Exchange.

9.      Defendant Michael R. Odell ("Odell") is, and at all relevant times has been, President, CEO, and a Director of the Company.

10.     Defendant Robert H. Hotz ("Hotz") is, and at all relevant times has been, Chairman of the Board of Directors of the Company.

11.     Defendant Irvin D. Reid ("Reid") is, and at all relevant times has been, a Director of the Company.

12.     Defendant James A. Mitarotonda ("Mitarotonda") is, and at all relevant times has been, a Director of the Company.

13.     Defendant John T. Sweetwood ("Sweetwood") is, and at all relevant times has been, a Director of the Company.

14.     Defendant James A. Williams ("Williams") is, and at all relevant times has been, a Director of the Company.

15.     Defendant Jane Scaccetti ("Scaccetti") is, and at all relevant times has been, a Director of the Company.

16.     Defendant M. Shan Atkins ("Atkins") is, and at all relevant times has been, a Director of the Company.

17.     Defendant Nick White ("White") is, and at all relevant times has been, a Director of the Company.

18.     Defendants named in paragraphs 9 through 17 are collectively referred to herein as the "Individual Defendants" or the "Board."

19.     Defendants named in paragraphs 9 through 18 are collectively referred to herein as the "Defendants."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

21.     Venue is proper in this district because Pep Boys has its principal place of business in this district.  Plaintiffs' claims arose in this district, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this district.

## SUBSTANTIVE ALLEGATIONS

### *The Company Has Rebounded And Is Poised For Future Growth*

22.     Pep Boys struggled, as many businesses have, through the economic downturn in the United States.  By the end of the Company's fiscal 2008 year on January 31, 2009, the Company had reported four years of net losses.  The Company's fortunes, however, began to improve following the implementation of severe cost-cutting measures, which allowed for streamlined operations and savings of $11 million per year.  The Company also began to benefit from the economic climate; consumers were holding onto cars longer and, thus, increasing the

need for goods and services provided by Pep Boys to keep these older vehicles on the road. As a result of the changes in operations and fortune, the Company began to emphasize investing in growth initiatives.

23.   This strategy yielded excellent returns as the Company reported three consecutive profitable years with net income of $23 million, $36.6 million, and $28.9 million for fiscal years 2009, 2010, and 2011, respectively.

24.   Its improved fiscal position has enabled the Company to execute an aggressive growth plan, which presents Pep Boys with the opportunity to sustain this success and enables the Company to grow further as the economy recovers. As Defendant Odell explained in the Company's December 6, 2011, conference call, Pep Boys has been able to reinvest its profits into its tire and services division, thus leading to growth in those areas. Moreover, such investments have not depleted the Company's cash as the Company still has $81 million on-hand and has not had to draw on its credit facility. As a result, the Company maintains a strong balance sheet and its ample cash flow makes it a very attractive merger target.

25.   Further, Odell expressed optimism regarding the early returns of the new e-service platform TREADSMART® ("TREADSMART"). TREADSMART is a new web application which Pep Boys launched to provide tire research, buying, and installation appointment services on-line. In the September 7, 2011, conference call Odell stated that this new technological service, along with others in the pipeline, would position Pep Boys to be the industry leader in online tire buying. This technology, along with the other innovations Odell spoke of, will provide Pep Boys with a new low-cost revenue stream to further supplement an already strong balance sheet, increasing its customer base going forward.

26.     Pep Boys' Chief Financial Officer Raymond L. Arthur ("Arthur") offered similar insight in a December 5, 2011, press release, in which he reported that the Company was exceeding its goals for growth.  Further, as a result of funding its growth through the Company's operating cash flow and revolving credit facility, Arthur forecasted that the Company could potentially refinance its 2013 and 2014 maturities.  Refinancing its existing debts would lead to greater availability of credit and provide further flexibility to explore or invest in growth opportunities.

27.     The Company's upward trend continued on April 4, 2012, when it released fourth quarter and year end results.  The reported figures indicated that "[s]ales for fiscal year 2011 increased by $75.0 million, or 3.8%, to $2,063.6 million from $1,988.6 million for fiscal 2010." Year end earnings, however, were slightly below 2010 results due to certain impairments and other charges, but not necessarily indicative of a slow down in the Company's return to profitability:

> The fiscal 2011 results also include, on a pre-tax basis, a net charge of $2.8 million comprised of a $1.6 million asset impairment charge, $1.5 million of acquisition and transition expenses related to our purchase of Big 10 Tires, and $0.8 million of merger and other transaction related costs, partially offset by a $1.1 million reduction in our reserve for excess inventory.

28.     According to an exhibit filed on Form 8-K with the SEC that accompanied the year end results, the Company's cash flow position remained solid.  For example, net cash provided by operating activities remained over $73 million while net cash and cash equivalents at the end of the period exceeded $58 million.  According to the figures related in the report, the decrease in cash flow – albeit slight – is attributable to a material increase in the number of acquisitions over the prior period – the catalyst for greater growth going forward.  Accordingly, the Company is using its cash to prepare for further growth.

*Announcement of the Proposed Transaction*

29.     On January 30, 2012, Pep Boys issued a press release announcing that the Company was being acquired by and had entered into a definitive merger agreement with The Gores Group.  The consideration being offered to shareholders was $15.00 per share.  The press release stated that the Proposed Transaction would value the Company at $1 billion.  Further, the press release highlighted that the $15.00 per share offer price was a mere 24% premium over the Company closing price on January 27, 2011 although as recently as May 2011, Pep Boys stock was trading near $15.

30.     On January 30, 2012, the Company filed a Form 8-K with the SEC, which contained the Merger Agreement.  As described herein, the Merger Agreement contains certain deal protection devices that only benefit The Gores Group.  These onerous provisions are designed to prevent other competing offers from emerging and thus, cap shareholder value.

*Pep Boys Shareholders Must Be Provided Material Information To Be Able To Evaluate Whether The Price Is Adequate or Inadequate*

31.     Pep Boys has successfully endured the economic downturn and emerged as a company with strengths including cost-efficiency and a strong balance sheet.  Further, the Company is poised for future profits and growth, which Pep Boys can achieve by capitalizing on its operational superiority and strong brand name.

32.     As the following stock chart indicates, in February of 2011, the Company's stock traded as high as $14.67, only .33 cents below the offer price.



33.     This is in stark contrast from January 2009, when the Company's stock traded below $3 per share, further demonstrating Pep Boys' resilience during a tough economy.

34.     Prior to the announcement of the Proposed Transaction, equity analysts considered the future prospects, along with the value of the Company's real estate holdings and strong cash position in providing target prices for Pep Boys in the high teens, well above the inadequate offer price.

35.     In fact, many analysts expressed that the merger consideration undervalues the Company.  Prior to the announcement of the Proposed Transaction, David Schlick of Stifel

Nicholaus rated Pep Boys as a "buy" with a target price of $17.00 per share, which constitutes a 13% premium to the offer price.

36.     Also prior to the announcement of the Proposed Transaction, Jeffrey Blaeser and Rob Rosenhaus of Morgan Joseph TriArtisan rated Pep Boys as a "buy" with a price target of $16.00, which also constitutes a premium to the offer price.

37.     Bret Jordan ("Jordan") of Avondale Partners presented a target price of $16.00 per share and was critical of the merger consideration in the Proposed Transaction, stating that the consideration was discounted and that a "high teens offer is probably more realistic than a $15 bid."

### The Company's Real Estate And Assets Were Valued Higher Than Its Market Cap

38.     In June 2011, according to Jordan, the Company's real estate holdings were appraised at approximately $690 million.  The Company's real estate holdings, combined with its recently reported cash position of over $80 million, amounts to a total value of $770 million. However, this valuation does not even take into account $600 million worth of inventory, the value of the Company's strong profits, growth prospects, and its brand name.   Thus, the Proposed Transaction fails to properly account for the true value of the Company and provide due consideration to the Company's shareholders.

39.     On December 6, 2011, Benchmark Capital issued a research report highlighting the Company's valuable real estate portfolio.  The report provides color on the statements of Jordan from Avondale Partners – specifically, that the real estate that was appraised was only the 232 owned stores, which totaled approximately $690 million.  This appraisal does not include the four distribution centers and two office buildings Pep Boys owns.

40.     According to Benchmark Capital research report published on December 21, 2011, the Pep Boys' real estate portfolio is worth $800 million conservatively.   Through the use of additional sale/leaseback transactions – a method which the Company employs in part, it could experience a valuable capital infusion, which would help to further grow the business.   Moreover, based on the market values at the time of the report, even after repayment of its net debt of approximately $214 million, the Company would still be left with close to $600 million, as compared to the Company's market cap of $594 million at the time.

41.     The Gores Group Merger & Acquisition team makes it its business to find companies that are undervalued by the stock market, in light of cash flows and readily marketable assets, and they recognized that the equity in the Pep Boys real estate portfolio *alone* was higher than the market cap of the *entire* Company. They also recognized that the Pep Boys real estate portfolio could easily be monetized through sale/leasebacks, thereby providing The Gores Group with nearly $800 million in cash to use for whatever purposes it sees fit and not necessarily to grow the Company – a "textbook" opportunity for a private equity firm.

42.     Notwithstanding its significant real estate and assets, it is also notable that if the Proposed Transaction is consummated, Pep Boys will have been acquired for the lowest value of any auto-parts retailer and servicer of comparable size in over a decade.   The current EBITDA multiple is 22% lower than eleven other auto-parts retailers and servicers worth $500 million or more. Thus, in examining the industry, it is clear that Pep Boys is being undervalued and the offer price fails to provide shareholders with the true value of the Company.

***The Process Was Improper***

43.     The inadequate offer price is the result of a flawed process where the Board of Directors failed to give due consideration to all strategic alternatives.   The Board did not

properly account for the Company's current and future value as a publicly-traded company. Further, there is no evidence to suggest that the Board performed a proper and thorough sales process, which would include giving due consideration to any offers from non-private equity buyers.

44.    Even if the Board did give proper consideration to all strategic alternatives available to the Company, the Board still failed to fulfill its duty to enter into a fair transaction. The failure to lead a full and fair auction of the Company has resulted in the inadequate offer price.

45.    The Board has the ability to dominate and control the business and corporate action of Pep Boys.  Further, the Board has access to material non-public information regarding the Company's financial condition and future prospects.   The balance of knowledge and economic power between the Board and shareholders is disproportionate in favor of the Board. Thus, there exists an inherent unfairness in the pursuit and execution of any proposed merger by the Board where they have failed to provide material information so that shareholders can make an informed vote on the Proposed Transaction.  Instead, the Board has opted to favor its own interests in preserving the positions of management and receiving a large monetary windfall upon the consummation of the Proposed Transaction.

46.    By exercising control of Pep Boys in a way that manipulates the sales process for self-gain, the Board was conflicted and engaged in self-dealing.  The Board has put its own interests before the Company's by failing to consider all strategic alternatives, which has resulted in the Board accepting an opportunistic offer to take the Company private.

47.    The Board is interested in closing the Proposed Transaction because it stands to gain a monetary windfall in "change-in-control payments."  Section 2.8(a)-(f) of the Merger

Agreement, provides that all Company stock options, performance stock units, and deferred stock units held by the Board would immediately vest and be cashed out upon the closing of the Proposed Transaction. The cash windfall for the Board will be enormous.

48.     Further, Odell is expected to remain on in his current capacity as CEO, a highly lucrative position which paid him $3.4 million in 2010. Odell may not have been able to continue to hold such a position if the buyer was another publicly-traded company, if that publicly-traded company wished to put in place its own management team. Even if Odell is removed, he will be handsomely rewarded with "change-of-control" payments of $3.5 million.

49.     Thus, the members of the Board were and are motivated to ensure the best possible outcome for themselves – a large cash windfall and preserving the positions of management, which runs counter to the interests of Pep Boys and its shareholders.

**Deal-Protection Devices**

50.     While the Merger Agreement provided for a "go-shop" period of 45 days, which allowed the Company to negotiate with other potential buyers, the onerous deal protection devices in place actually rendered the "go-shop" provision largely illusory. The Merger Agreement contains a termination fee and matching rights provision, designed to eliminate the possibility of a competing bid from arising.

51.     The matching rights provision, as provided in section 7.3(d), restricts the Company's ability to accept a superior proposal and makes it less likely that a competing bid will emerge. The matching rights provision requires the Company to provide notice to The Gores Group of any rival offer and, if the Board determines that the rival offer is superior, The Gores Group and the Board would then have three days to negotiate in an attempt to amend its offer to until the offer no longer constitutes as a superior proposal. In addition, The Gores Group would

have the benefit of unfettered access to the competing proposal eliminating any leverage the Company might have in these discussions.

52.     Any competing bidder would have had to endure the costs of expedited due diligence and then made a superior bid.  Moreover, such a competing bid would likely have been matched by The Gores Group, who would have access to the terms of such competing proposal. Thus, there was minimal motivation for a competing bid to emerge based on the presence of the matching rights provision, which skewed the entire go-shop process in the favor of The Gores Group.

53.     In failing to secure an unrestricted go-shop provision that would have ensured a fair and complete auction of the Company, the Board increased the probability that the Proposed Transaction would close and that its interests would be satisfied.  In the alternative, as with all deal-protection devices, if such a restricting go-shop provision was a requirement of The Gores Group, the Board should have been able to secure additional shareholder consideration for the restriction's inclusion, which it did not.

54.     The termination fee provides further disincentive as the Company will have to pay The Gores Group a $10 million termination fee if a superior proposal is accepted during the go-shop period.  This additional cost along with the cost of expedited due diligence renders it very unlikely that a competing bid will emerge.  Further, if any competing bid should emerge after the "go-shop" period, the termination fee escalates to $25 million.  Indeed, no competing bid has emerged.

55.     There is no evidence to suggest the inclusion of the termination fee or its escalating condition was offset by any change in shareholder compensation.

*The Materially Misleading And Incomplete Preliminary Proxy Statement*

56.     It is important that the Proxy contain full and accurate disclosure of all relevant information so that shareholders can make an informed decision as to whether to vote in favor of the Proposed Transaction, especially in light of the numerous flaws described above, which are absent from or materially misrepresented in the Proxy.

57.     On March 7, 2012, the Company filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote for or against the Proposed Transaction.

*Background Of The Merger*

58.     The Proxy indicates that in the fall of 2010, "in response to unsolicited inquiries from several financial acquirers, our board of directors engaged BofA Merrill Lynch to act as Pep Boys' financial advisor…" ("Merrill Lynch").  The Proxy fails to state whether unsolicited inquiries of this type were common and, if so, what led to the retention of Merrill Lynch at that time.  If such inquiries are not common, the Proxy fails to state what triggered the unusually high level of inquiries.  The Proxy also fails to state what management believed was the predicate for the inquiries.

59.     This is a material omission because an investor would want to know whether management thought the Company was undervalued at this time, whether it was portrayed as such in the marketplace, and whether the interested parties were interested in the Company's valuable real estate portfolio – a discussion of which is entirely omitted from the Proxy. Assuming the real estate portfolio was a topic of conversation, investors would want to know

how it factored into both management's and potential buyers' assessment of the Company's value. Moreover, the omission of real estate valuation information – assuming it existed and it is wholly reasonable to assume that it was – renders all other valuation based statements in the Proxy at least misleading if not false.

60.     The Proxy fails to state the Board's vetting process concerning the retention of Merrill Lynch, its history of dealings with Merrill Lynch, and disclosure of any conflicts. This is a material omission because information concerning potential conflicts bears directly on whether the Board sufficiently exercised its fiduciary duties by retaining adequate advisors and whether the amount of consideration or terms of the Proposed Transaction were unfairly influenced by interested parties. For example, it is material to know whether Merrill Lynch has performed professional services for The Gores Group or if there is any cross-investment between Merrill Lynch, Pep Boys and/or The Gores Group or its portfolio companies. The failure to disclose this information renders Merrill Lynch's fairness opinion misleading because it is not disclosed whether Merrill Lynch has any interests adverse to Pep Boys' shareholders.

61.     The Proxy indicates that "[i]n response to a request from a representative from a financial acquirer, which we refer to as Party A, on July 25, 2011, Mr. Odell met with representatives of Party A. On August 4, 2011, we entered into a non-disclosure agreement with Party A. On August 5, 2011, representatives from Pep Boys met with representatives from Party A to present Pep Boy's publicly-available investor presentation."

62.     The Proxy, however does not mention Party A again until at least January 6, 2012. Investors should be informed as to whether there were any communications between the Board or senior management and Party A in between those dates and whether Party A was given access to other information (either public or non-public) during that period.

63.     The Proxy states that on October 11, 2011, "[g]iven the existing relationship with BofA Merrill Lynch, Pep Boys requested that BofA Merrill Lynch review the proposal received from Gores and prepare a valuation analysis of Pep Boys." However, the Proxy does not explain the "existing relationship," in light of its statement that Pep Boys "terminated the engagement of BofA Merrill Lynch" in February 2011 (Proxy at 24).

64.     The Proxy states that, "On October 28, 2011, Gores and its advisors were granted access to certain of our due diligence materials through an online data room," but it fails to state whether any potential competing bidders were given the same privilege.

65.     The failure to disclose information concerning whether the process was competitive bears upon whether Defendants favored one party over another or slanted the process in favor of a buyer that would financially benefit Defendant Odell and senior management. Accordingly, the failure to disclose information concerning whether one or numerous parties entered the data room bears directly on whether the Board of Directors' Recommendation in favor of the Merger Agreement contained in the Proxy was based on a good faith investigation.

66.     The Proxy states that "On November 15, 2011... Mr. Odell advised our board of directors regarding the preliminary discussions with Party C," however, the Proxy does not advise shareholders of the status of those discussions, the status of the discussions with Party A or whether Parties A or C had any discussions with the Board or senior management concerning any potential employment arrangements.

67.     According to the Proxy, "Party C" was a strategic buyer. Given that it is common for strategic buyers to offer both more consideration (either in stock, cash, or a combination thereof) for a target than a private equity concern and then replace the target's management team

once the deal is complete, shareholders are entitled to complete disclosure concerning these negotiations with a strategic buyer in order to determine whether the process resulted in adequate consideration and was not the product of a self-interested management team.

68.     The Proxy states, "On November 23, 2011, Pep Boys entered into an agreement with Gores that provided for an exclusive negotiation period through and until December 30, 2011, at which time the exclusivity obligations would continue until such time as Pep Boys provided written notice of termination," without explaining why Pep Boys would agree to such exclusivity when discussions were ostensibly underway with Parties A and C.

69.     The Proxy states, "On January 6, 2012, representatives from Pep Boys and BofA Merrill Lynch provided to Gores an update on recent performance, which was the basis for the Pep Boys Management Forecast...." However, the Proxy fails to disclose what those forecasts were and what they indicated relative to the Company's recent performance and therefore investors have been materially disadvantaged, unlike The Gores Group, in valuing the Company and its likely future stock value.

70.     This is a material omission because it is universally recognized that forecasts should be disclosed to stockholders when asking them to render a decision on a change of control transaction.  Also, the failure to disclose whether the forecasts were given to Parties A or C renders any indication in the Proxy that the Company was dealing at arm's-length with all potential suitors misleading.  Indeed, the Proxy's statement that it provided "on November 19, 2011, . . . certain additional information to Party C" is misleading because it does not inform shareholders whether party C was privy to the same information as was provided to the Gores Group, any internal forecasts or general, public information.

71.     The Proxy states that on "January 10, 2012, Gores submitted a revised offer, together with a mark-up of the draft merger agreement, drafts of equity and debt financing commitment letters, and revised drafts of the guarantee agreements. Gores' revised offer reflected a per share price of $14.50. Gores indicated that the $1.00 per share price decrease was due to the results of its due diligence review, Pep Boys' recent performance and certain one-time cash costs that would be incurred at or within one year of closing." However, The Gores Group had access to Pep Boys online data room for approximately two months when its investment committee, on December 27, 2011, had conditionally approved the $15.50 price. The Proxy fails to state what information regarding costs and capital expenditures The Gores Group had become aware of in between that time and January 10, 2012 that it did not have for the previous two months.

***Opinion Of Merrill Lynch***

72.     The Proxy, in the section entitled *Pep Boys Financial Analyses*, also fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote in support of the Proposed Transaction.

73.     For example, in the sub-section entitled *Selected Publicly Traded Companies Analysis,* the Proxy fails to indicate objective criteria, if any, used in selecting the 18 companies and reasons why Merrill Lynch deemed such companies as H&R Block and PetSmart, for example, to be sufficiently comparable to Pep Boys so as to provide meaningful evidence of value.

74.     The Proxy fails to provide the assumptions underlying the indicated 12% cost of equity (e.g., beta, risk-free rate, equity risk premium, other risk premia, if applicable).

75.     The Proxy fails to provide information regarding the observed pricing multiples of the selected public companies.

76.     The Proxy states that "cash flows and terminal values were then discounted to present value as of January 31, 2012 using discount rates ranging from 10.0% to 12.0%, which were based on an estimate of Pep Boys' weighted average cost of capital," but it fails to state Merrill Lynch's assumptions underlying the cost-of-equity analysis or the other assumptions used in the Weighted Average Cost of Capital ("WACC") analysis (e.g., pretax cost of debt, tax rate, relative proportions of debt and equity in the capital structure). This is especially pertinent given that the upper end of the WACC is equal to the cost of equity, implying zero debt in the capital structure.

77.     The Proxy states that Merrill Lynch will receive a fee of approximately $7.8 million dollars, "a significant portion of which is contingent upon the completion of the Merger." However, the Proxy fails to state specifically what portion is contingent on the completion of the Merger.

78.     The Proxy, while indicating the existence of past and possible future business relationships with Merrill Lynch, fails to state compensation paid by the buyer in the past two years, as well as any amounts due or expected from the buyer in the future.

79.     The Proxy's table of projected financial figures omits unlevered free cash flow, again, hindering shareholders' ability to value their shares.

80.     The Pep Boys Management Forecasts Table, in Footnote 1 of the Proxy indicates that 2013E earnings per share were "adjusted for non-recurring items associated with certain expected refinancing," but it fails to disclose the amount of the adjustment.

*Pep Boys' Real Estate*

81.     Finally, and most significantly, the Proxy is completely devoid of any information regarding the value of the Company's substantial real estate holdings.  Given the significant value of these holdings and how such value may reflect on the fairness of the consideration being offered, the exclusion of this highly material information renders the Proxy false and misleading. In fact, any analysis of the Company's value that does not include the real estate component is virtually meaningless. Further, the Proxy fails to state to what extent, if any, Merrill Lynch evaluated Pep Boys' real estate holdings.

82.     Indeed, omitting from the Proxy real estate valuation information is especially false and misleading to stockholders given that numerous securities industry analysts have pointed directly to the real estate issue as a critical part of the transaction.

83.     Specifically, the Proxy's omission of this information renders all other statements concerning the value of the Company false and misleading given that in June 2011, the Company's real estate holdings were appraised at approximately $690 million.  Further the Company's real estate holdings, combined with its recently reported cash position of over $80 million, amounts to a total value of $770 million.  This figure, however, does account for $600 million worth of inventory

84.     On December 6, 2011, Benchmark Capital opined that the real estate appraised was only the 232 owned stores, which totaled approximately $690 million.  This appraisal did not include the four distribution centers and two office buildings Pep Boys owns.  Benchmark Capital later reported on December 21, 2011, the Pep Boys' real estate portfolio was worth $800 million conservatively.  Through the use of additional sale/leaseback transactions – a method which the Company employs in part already, it could experience a valuable capital infusion, which would help

to further grow the business.  Moreover, based on the market values at the time of the report, even after repayment of its net debt of approximately $214 million, the Company would still be left with close to $600 million, as compared to the Company's market cap of $594 million at the time.

85.     The Proxy, however, fails to disclose any of this information in a way that would allow stockholders to assess whether the proposed consideration even remotely approaches the Company's intrinsic value.  In fact, the omission of this information renders all other valuation information in the Proxy misleading if not patently false to the extent that defendants take the position that the valuation information is complete and reflects all known contingencies.

86.     The Proxy fails to disclose whether Defendants have modeled or taken any steps towards entering into the sale/leaseback transactions discussed above.  It is unlikely that a private equity concern and a target would have failed to address this rich source of cash during negotiations.  This is especially so given that that the equity in the Pep Boys real estate portfolio *alone* was higher than the market cap of the *entire* Company.

87.     Conversely, the Proxy omits detailed information concerning whether the Board failed to use the real estate portfolio as leverage to obtain a higher price or intentionally decided not to on its own or upon the recommendation of its advisors.  Omitting information concerning whether the Board used (or failed to use) the Company's real estate portfolio to press for a higher price renders any statement in the Proxy that the process was handled diligently false.

88.     Simply stated, the Proxy's failure to detail: a) the value of the real estate portfolio; b) how it was accounted for in the transaction's negotiations; c) whether the Board failed to use the portfolio as a tool to obtain greater consideration; d) whether the parties considered or modeled for sale/leasebacks; and e) that the value of the real estate and monetizing it ostensibly pays for the deal renders the Proxy false to the extent that the directors state on page 1 of the Proxy that  "[a]fter

careful consideration, our board of directors determined that the Merger Agreement and the Merger are fair to, advisable for and in the best interests of Pep Boys and Pep Boys' shareholders."

89.     The significant real estate related material omissions combined with the numerous and significant material and misleading statements and omissions in the *Background of Merger* and *Pep Boys Financial Analyses* sections of the Proxy render it impossible for Plaintiffs to fairly assess the theoretical present value of their shares, rendering them unable to make an informed decision regarding their vote regarding the Proposed Transaction.

**COUNT I**

**VIOLATION OF SECTION 14(a) OF THE 1934 ACT AND
RULE 14A-9 PROMULGATED THEREUNDER**

90.     Plaintiffs repeat all previous allegations as if set forth in full herein.

91.     The Individual Defendants have caused Pep Boys to prepare and file the Proxy with the SEC with the intention of soliciting shareholder support of the Proposed Transaction.

92.     Defendants disseminated the false and misleading Proxy specified above, which failed to disclose the material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     The Proxy was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets as a stand-alone entity and as a merger partner for The Gores Group.

94.     In so doing, Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their

positions within the Company, Defendants were aware of this information and were aware of their duty to disclose this information in the Proxy.

95.    Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.  The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy.

96.    By reason of the foregoing, Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

97.    Because of the false and misleading statements in the Proxy, Plaintiffs are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATION OF §20(a) OF THE 1934 ACT

98.    Plaintiffs repeat all previous allegations as if set forth in full herein.

99.    The Individual Defendants acted as controlling persons of Pep Boys within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Pep Boys, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

100.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the Proposed Transaction giving rise to the securities violations as alleged herein, and exercised the same.    The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of this document.

102.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Transaction.    The Proxy purports to describe the various issues and information that they reviewed and considered and which had input from the Board.

103.    Moreover, the Individual Defendants each have the duty individually to discover and correct any material misstatement or omission of material fact, which they have failed to do. By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

104.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs will be irreparably harmed.

**WHEREFORE,** Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(a)    enjoining, preliminarily and permanently, the Proposed Transaction;

(b)    enjoining defendants, their agents, counsel, employees and all person acting in concert with them from consummating the Proposed Transaction unless and until the Company adopts and implements a fair sales process that includes amending the Proxy so that it no longer omits material information concerning, among other things, the Proposed Transaction;

(c)    in the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiffs rescissory damages;

(d)    directing that Defendants account to Plaintiffs for all damages caused by them and account for all profits and any special benefits obtained as a result of their violation of the federal securities laws;

(e)    awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts; and

(f)    granting Plaintiffs such further relief as the Court deems just and proper.


### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

DATED:  April 10, 2012

/s/ Denis F. Sheils
Joseph C. Kohn
Denis F. Sheils
William E. Hoese
Barbara L. Moyer
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700

*Lead Counsel for Plaintiffs*

Gregory M. Nespole
Matthew M. Guiney
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600

Benjamin Y. Kaufman
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Tel: (212) 594-5300

Jacob A. Goldberg
Sandra G. Smith
**FARUQI & FARUQI, LLP**
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel. (215) 277-5770

Donald J. Enright
**LEVI & KORSINSKY LLP**
1101 30th Street, NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290

Krishna B. Narine, Esq.
**MEREDETH & NARINE**
1521 Locust Street, 8th Floor
Philadelphia, PA 19103
Tel. (215) 564-5182

Hamilton Lindley
**GOLDFARB BRANHAM LLP**
2501 N. Harwood Street, Ste. 1801
Dallas, TX 75201
(214) 583-2257

*Attorneys for Plaintiffs*